AMBRO, Circuit Judge,
dissenting.
When an alien claims that a deficient record riddled with “indiscernible” notations prevents the BIA from conducting a meaningful review of his or her appeal, the relevant question is whether the “indiscernible s” occur at a “critical juncture” in the transcript. McLeod v. INS, 802 F.2d 89, 95 (3d Cir.1986). “Transcript deficiencies reflect adversely upon the integrity of the administrative process, and upon the possibility of meaningful review during the critical appellate stage.” Id.
The transcript provided for our review is unfathomably poor; by my count there are 184 instances of “indiscernible” in only 13 pages of expert testimony alone, and the remainder of the transcript is riddled with other instances. Over 20 years ago we noted that we were “appalled by such faulty records, and we do not take petition *762 er’s objection lightly.” Id. Twenty years later, it seems that the Government has made little progress toward fulfilling its statutory duty to provide “a complete record ... of all testimony and evidence produced at the proceeding.” 8 U.S.C. § 1229a(b)(4)(C); see 8 C.F.R. § 1240.9 (“The hearing before the immigration judge ... shall be recorded verbatim.”).
The IJ made a number of factual conclusions based, in part, on the expert. In particular, the IJ noted that “[the expert] did not conclude that Respondents would be subjected to persecution and also did not conclude that Respondents are members of a group subject to a pattern or practice of persecution in Uzbekistan.” App. 140 (IJ Decision, Mar. 27, 2006). The IJ based her analysis on this fact, noting that
[w]ith regard to ethnicity or nationality of the Respondents as Iranian, [the expert] does not conclude that there exists a pattern or practice of persecution in Uzbekistan against Iranian[] nationals. The written evidence concerning country conditions also does not contain such a conclusion. Therefore, Respondents are obliged to prove an individualized claim to asylum to prevail.
App. 149. Thus, the IJ’s evaluation of the expert testimony was a critical factor in her factual assessment of whether the Ab-dullozodas would face persecution on their return to Uzbekistan.
The transcript of the expert’s testimony is practically incomprehensible. Although the expert was a live witness, the transcript nonetheless contains an average of over 14 instances of “indiscernible” per page. In particular, the expert’s conclusions, as transcribed, are riddled with “indiscernible” notations. This is a portion of the testimony, as transcribed:
Q. And, doctor, would you please tell the Court how are (indiscernible) are treated in Uzbekistan?
A. After the break of the Soviet Union when (Indiscernible) Uzbekistan (Indiscernible) how to (Indiscernible) and actually a few choices, or four choices, (Indiscernible). Choice number one was democracy, (Indiscernible) choice number two was (Indiscernible) and choice number three nationalism, choice number four (Indiscernible) religious state. He went through the path of nationalism and nationalism became like major (Indiscernible), though this point (Indiscernible) were integrated in society, and (Indiscernible) suffered discrimination, persecution in (indiscernible). It lead to enormous migration out of the country by (Indiscernible), none of the populations (Indiscernible), ethnic Russian, which comprised with biggest, I would say one of the biggest ethnic groups in Uzbekistan (Indiscernible) their number, a number of [J]ews got (Indiscernible) five times. Okay, I would say that other groups with some perception are (Indiscernible) and these people shows the position of (Indiscernible) ethnic groups which played a very important role in being (Indiscernible), just (Indiscernible), and after the (Indiscernible). First of all, (Indiscernible) the majority of (indiscernible) homes (Indiscernible). The (Indiscernible) agencies were (indiscernible) from (Indiscernible), the Russians, and it (Indiscernible) were (Indiscernible) nationally (Indiscernible) it was (Indiscernible). And, since the time the Government followed the policy of weeding out non (indiscernible).
Q. Okay, and what is (indiscernible)?
A. The word (indiscernible) is Russian, which is very difficult to translate, because (Indiscernible) writing *763 down, but (Indiscernible) translation. (indiscernible) means (Indiscernible) belief, again, (indiscernible) this idea from the Soviet Union, historically the (Indiscernible) and (Indiscernible) special registration which is mandatory at the time, and (Indiscernible) into the country which indicated (Indiscernible), and this box (Indiscernible) and the (Indiscernible) according to (Indiscernible). The (Indiscernible) by the special (Indiscernible) and by the officers or by the officials who support (indiscernible), or regional administrative, original (indiscernible).
Q. Does it exist the name Uzbekistan?
A. Yes, it exists, (Indiscernible).
App. 180-82 (IJ Proceedings Tr. 24:22-26:13). It is difficult to follow this portion of the transcript in which the expert attempts to describe the history of ethnic tension in Uzbekistan.
This sets up the next portion of his testimony — the attempt to describe what specifically would happen to the Abdullozo-das if they were returned to Uzbekistan:
Q. And in accordance with local rules what does a person living in the country have to do upon his arrival back to Uzbekistan?
A. When the person comes back (Indiscernible) at a time, he’ll (Indiscernible), or (Indiscernible), this point the person had to report to (Indiscernible) that he or she have arrived to (Indiscernible), or he has to take care of that and to do (Indiscernible), arrange (Indiscernible).
Q. Okay, and sir, in your opinion what can happen to the respondent if he returns to Uzbekistan?
A. (Indiscernible) this gentleman can experience a lot of (Indiscernible)—
JUDGE TO MR. KOTLER [the expert witness]
Q. You read the asylum application?
A. Yes, because (Indiscernible) to get (Indiscernible).
Q. Well, I just needed to know whether you read it Doctor Kotler, that was all.
A. I’m sorry.
Q. Go ahead.
A. And, (Indiscernible) understand the full situation and to this point (Indiscernible) problems with the authorities (Indiscernible) he can face persecution again and his (Indiscernible) would be known to the authorities because he must go to the police and report himself.
App. 182-183 (IJ Proceedings Tr. 26:14-27:13). Unlike the transcript in McLeod, which involved 96 instances of “indiscernible” occurring largely “within colloquies between the judge and counsel that [did] not bear on the legal or factual issues of the case,” 802 F.2d at 95, the testimony in our case occurred during the testimony of an expert witness, and “the import of many of the omissions” is not “detectable from the context of the dialogue,” id. In particular, the expert’s conclusion is indecipherable and, unlike colloquies between the judge and counsel, it is undoubtedly a critical juncture in the transcript. Id.
In our case, the BIA “note[d] that the transcript contains numerous ‘indiscerni-bles,’ particularly during the testimony of the respondents’ expert witness.” App. 99 (BIA Decision, July 30, 2007). It found the expert’s testimony to be “ ‘too general and broad-brushed’ to support the respondents’ requests for relief.” Id. (citing Ambartsoumian v. Ashcroft, 388 F.3d 85, 88 (3d Cir.2004)). It further concluded that “the transcript deficiencies do not prevent us from determining that the Immigration Judge’s findings are not clearly erroneous.” Id.
Given the embarrassingly poor quality of the transcript provided to the BIA, I am at *764 a loss to understand how the BIA could have discharged in earnest its duty to review the Id’s factual findings for clear error on the record in this case. See 8 C.F.R. § 1003.1(d)(3)(i). I simply cannot tell from the transcript whether the IJ made a clearly erroneous factual finding— indeed, from the transcript it is difficult to divine the expert’s conclusion on the persecution question.
While I pass no judgment on the ultimate conclusion of the IJ or the BIA, I cannot conclude that the BIA discharged its duty in this case. I would grant the petition for review and remand to the BIA with instructions either to obtain a clear copy of the transcript or, if no such copy is obtainable, remand this case to the IJ for a new hearing. I thus respectfully dissent.